At this time, would Counsel for the Appellant Cross Appellee Aadland please introduce himself on the record to begin. Before you do that, let me just make sure that Judge Helpe can hear us. Judge Helpe, are you able to hear us? I can hear you. Can you hear me? Yes, we can. Okay, yeah. Judge Helpe, as you can see, is joining us remotely. Do I need to change? That's good if it's higher. Yeah. Okay, thank you. If it pleases the Court, good morning, Your Honors. My name is Andrew Saunders. I represent Mr. Magnus Aadland, who is the plaintiff in this matter. I'm here today with my co-counsel, Attorney Kathleen Kramer, and Attorney Scott Lang. Preliminarily, Your Honors, I would like to request three minutes of time for rebuttal. You may. Thank you. And although I will endeavor to hit every point in my outline, I know that that's not     I'll start out by asking the question, why are we here? This is the second time in which this matter has been before this Court. We had a trial in 2020 following Mr. Aadland's injury back in 2014, so it took six years to get to trial. When it came up to this Court in 2022, this Court issued a, what we will describe as a very well-reasoned decision that we think is still, the law is still applicable. And what this Court did was it wrote approximately 54 pages of what I'll call guardrails for the trial court to follow when it went back down to the trial court to implement the general law, the general maritime law of the United States. And specifically, there was a question of fact that the record did not show previously. And the question was, did Mr. Aadland incur the $605,000 in cure or medical expenses? And I'm using the verb incur in a specific way because that's the language in the statute. That's the language in the case law. If he had incurred that amount, then this panel, this Court in the last panel used the word non-fate. And the word abandoned was used in a Supreme Court case, I believe it was the Dutra case, explaining why the general maritime law has incentives. We don't have a huge amount of time, and we're pretty familiar with how we got here. So here's what would be helpful for me. On appeal, are you contesting anything other than the punitive damages ruling and the emotional distress ruling? No, Your Honor. As a general premise. Okay. So the conclusion by the district court that there's a $30,000 credit with respect to the cure, that is not being contested? Well, in our brief, we did not contest that. However, I apologize. Well, the time to do it is in the brief. So I read the brief correctly if I don't read you contesting that. Yeah. So you are contesting the emotional damages ruling, which was adverse to you, and the punitive damages ruling, which was adverse to you? Correct. So could you just address those two parts and why you think the district court was wrong? Yes, I will. So I'll go to the compensatory damages first, and then I'll get to punitive damages second. The actions on the part of the defendant unlock different levels of culpability. And if the defendant is unreasonable, then you're eligible for compensatory damages. The trial court, when the matter went back down to remand, found in Paragraph 77 of the conclusions of law that Mr. Arlen did, in fact, suffer some emotional damage. However, she found that that damage was caused as a result of Tufts in their what I'll call algorithm quagmire of you can only have this amount of care, whereas the standard of the general maritime law is the crew members should get the medically reasonably necessary care, which I submit is a matter of medical determination by his treating physicians. The court then went on, and this is the nub of our argument in this account. In Paragraph 80 of the conclusion of law, let me read it to the court. The evidence does not show that had Boat Santa Rita II timely fulfilled its cure obligations, it would have paid for any treatment that Arlen would not have otherwise received that was not covered by Tufts. In essence, what the court is doing is saying that we need to prove that the emotional distress was not inevitable. The trial court flipped the burden to us to prove that had the boat fulfilled its obligations, Mr. Arlen would not have incurred these emotional distress. As a general premise, the general maritime law says that we must prove causation in the traditional sense in part four, and your honor, Mr. Justice Barron, you went into this at oral argument the last time in around minute 25, and the defendant had a duty to provide cure. The defendant had a duty to advise Mr. Arlen of their cure. Because they did not do that or they did not do that, Mr. Arlen then used Tufts Medical for his own health insurance or to pay the health coverage. That then caused him to go through this situation which he in fact received this emotional toll. And that's the word that your honor used in the argument in the briefing the last time. We have proved that that happened. So if the defendant wants to show that it was inevitable, I submit as a matter of law, because this is a court sitting in equity, you need to or the court should require that the defendant prove that it would have been inevitable, not that the plaintiff needs to prove that it would not have been inevitable. That is the number four argument on causation. What's your authority for that proposition? It's the general maritime law of the United States, your honor. Was there any case that would, no. No, your honor. But we, admiralty law is a court of equity, and I submit it would be inequitable to have a party that was not at fault have to prove that the party that was at fault would have done something differently. It should be the party that's at fault that has to prove they would have done, that the damage would have been inevitable. Could you just spell out for me how in your imagined world it would have worked such that the emotional toll that you're attributing to their failure to fulfill their duty of cure, which left him to rely on Tufts. Had that not happened and they had paid what they were supposed to pay, in your view, and fulfilled the duty of cure, what do you imagine, what's the scenario that would have happened that would have been different? Well, the factual scenario that would have happened in that, your honor, is the adjustment mechanism or the adjustment protocols that the boat has through its own insurance company. Those would have taken over, and the marine insurance adjuster would have dealt with it on. It's not Tufts. And the marine insurance adjuster, the standard, is not what Tufts says is allowable under their algorithm. Is there anything in the record showing that what Tufts said was wrong and that a reasonable insurer would not have done that? No, your honor. How would we have any reason to think that it's attributable, even in an expanded idea of causation, that the thing that he would have suffered had he not been dealing with Tufts? What would I rely on to say the world would be different if Tufts hadn't been involved? Well, that's a factual road that you'd have to go down. And when I look for the facts, you have some burden of showing causation. What could I possibly rely on in the record that would suggest it wouldn't have happened if he hadn't been forced to rely on Tufts? But that factual scenario never evolved because Tufts was involved. Right, but one way you could prove that would be to put in expert testimony saying Tufts' judgments here were unreasonable. But there's nothing saying that. Or is there something saying that? Yes, your honor, there is. There's actually two documents that are in the record in which Mr. Ardlin's treating physicians said he needed reasonably medical, reasonably necessary medical care. All right? And one happened in July of 2014, and that's page A940 in the record. And the other one happened in December of 2014, that's page A938 in the record. Mr. Ardlin's treating physicians said that he needed a certain type of care. Not while he's in the hospital, but he has a stroke. He needs to go and have his valve replaced. He's not strong enough to do that, so he has to go to skilled nursing to gain his strength to do it. It took six months to get enough strength to do this. The question was, where is he going to go? What skilled nursing care? Tufts did not want him to go to Spalding Rehab, which is an acute care facility. They wanted him to go to a place called Bear Hill, which is a lower level. His treating physician said he should go to this acute care hospital. It happened the same thing back in December of 2014. And again, I've cited in the record where those two things are. So there are instances in which his treating physician said he needs to have a different style of care. But Tufts said no, time out, that doesn't fit inside our parameters. You only get so many visits per year, you've used up your time at acute care. On that same topic, Your Honor, and I'll go into the punitive damages aspect now. Counsel, before you go into the punitive damages, you're arguing for the standard causation of the traditional one. But notwithstanding that, even from my reading of the record, the district court didn't really dispel the standard causation. But the trial court did go and make an evidentiary conclusion that specifically the trial record contains no evidence of emotional distress that was caused by BSR 2's failure to cure or delay in doing so. Isn't that a way of the evidence, credibility determination by the district court? And if so, should we give deference to those factual findings? So I would submit that it's a mixed question of law and fact. You do give deference unless the underlying basis upon which that conclusion is based is flawed. And I would say the underlying premise is flawed based upon the misapplication of the causation standard. Therefore, you don't give deference, and therefore it's a de novo review in essence. That's how I would answer the question. But even if we disagreed with you about that on the causation standard, I take it you're saying that the assessment is essentially a sufficiency analysis, and you're saying it doesn't take account of those two documents or what you're hanging your hat on for that? Yes, you're right. I would submit that under either standard it was wrong. And below to the district court, did you raise this argument about the evidence from that doctor? Yes, Your Honor. And it's in the trial record. Do you want to move on to the punitives? Yes, Your Honor. So this really is the most important part of the matter. Because the Supreme Court has set up what I'll call they've set up a mechanism which creates incentives or encouragements for boat owners to follow the general maritime law of the United States, to give care to injured crew members when it's necessary. And if you don't follow that, then you could be subjected to punitive damages. And in this instance, this case is almost identical to the Vaughn matter in which the Supreme Court in 1962, and that was a maintenance case. This is a cure case. The Supreme Court said that the plaintiff in that case was plainly owed his benefits under the general maritime law. In this matter, in the first panel, the defendant actually admitted that early on, and this is in the record, this is minute 21 through minute 25, in the record of the last oral argument, they admitted that early on they understood that Mr. Oglin was entitled to maintenance and cure. There was a series of e-mails back and forth as soon as the insurance company got involved, and it's found in the record in paragraphs in pages 830 to 892, and it shows a scheme. And specifically, if you look at document A844, that is a letter from an insurance adjuster in the U.K. when she gets the first report of this incident, and the recommendation is to do nothing. She immediately writes back and says, this is a situation in which Mr. Oglin is likely entitled to cure. You need to promptly inform him of that right, because if you do not do that, you will be subjected to liability under Atlantic Soundings v. Townsend. She actually cited the U.S. Supreme Court case that came out in 2016, I believe, 6 was when it was. She cites that case. That's exactly what happened here. They did not tell Mr. Oglin of his rights, and even if they did tell him of his rights, there was an incident, that same incident in December of 2014, Your Honor, that I just spoke about. Mrs. Oglin is told by Tufts that her husband is having his valve replaced, and his doctor has prescribed 21 days of inpatient care or acute care afterwards. You can finish this thought. Thank you, Your Honor. Acute care afterwards. Tufts says to them, you only have 14. She calls the boat and says, I need help. They get involved, and this is in the record. They get involved and says, we will go talk to someone at Cambridge Spaulding. They never got back to her. She had to call three times, Your Honors, to do that. There was silence. They abandoned her. They abandoned Mr. Oglin to his fate. With that, I will rest for my rebuttal. Thank you very much. Any further questions? Thank you. Thank you. Would counsel for the appellee please introduce himself on the record to begin? Good morning, Your Honors. May it please the Court, Francis McSweeney for the defendant appellant, boat Santa Rita II. The vessel owner's duty to provide maintenance and cure is rooted in the contract of employment with its seaman. For that reason, tort concepts like the collateral source rule do not strictly apply to the maintenance and cure context. Rather, the vessel owner's duty is to ensure that the injured seaman receives the reasonable and necessary medical treatment at no cost to the seaman. In this case, boat Santa Rita II has done that. The fact that Tufts paid first rather than boat Santa Rita II doesn't evidence any breach by boat Santa Rita II. Before we get to that, do you understand the district court to have found that there was a breach of the duty of care? I do to an extent, Your Honors. I do understand that the court found that we were responsible for paying maintenance and cure and that the cure amount wasn't fully paid. And are you contesting that ruling to us? No. I think we agree that the cure amount was owed to Magnus Odlund, or rather that we were responsible for satisfying his reasonable and necessary medical treatment expenses. We're talking past each other. Sure. Do you think the district court concluded you breached your duty to pay care? I don't know that she found that, Your Honor. Okay. On appeal, are you arguing that you did not breach your duty to pay care, which is a different question than whether if you did breach it, have you nonetheless paid all of the cure? Yes. I think that's the argument, Your Honor. What's the argument? Is that even if the assuming that the cure obligation was owed to Magnus Odlund, that by paying his out-of-pocket medical expenses, reimbursing those to him, by advancing him, you're missing the point I want you to focus on. Sorry. That's my fault. I understand that you agree that there was a cure obligation. Correct. There's a question, did you breach the cure obligation? If you did, the normal way it would work is there would be a judgment. Correct. Here's what you owe for the breach. Owe, you have a separate agreement in which you agreed to pay that judgment through the advance payments. That would be a way of satisfying the judgment. Correct. A different account is we had a duty of cure and we satisfied it. We never breached it because we paid cure. Not that we paid the judgment for the breach of the duty of cure, but we paid cure itself. Which are you saying on appeal? I'm saying the second argument, Your Honor, that we've satisfied the obligation to pay cure and did not breach the duty because by the time of trial, any expenses that Magnus Odlund had incurred for his treatment had been reimbursed or had been satisfied by both senators. Be that with payments directly made to Magnus Odlund or to the senator. And that's then dependent on us treating the advance payments as cure payments. I think the advance payments, Your Honor, should be viewed as what they were presented to Magnus Odlund as, which is a right to reduce any future obligation to Magnus Odlund or existing obligation to Magnus Odlund. Are they cure payments? In this context, I believe that they are. Even though by the terms of the agreement, they didn't have to be used for cure, they could have been if he won on the compensatory damages claim, they would have been used to pay off the compensatory damages independent of the cure obligation. So how can we treat them as cure payments? Well, I think the record does show that at the time that they were made, there was his medical expenses and his health insurance premiums were taken into consideration. That's actually how they arrived at the $114 per day in advances that were given to Mr. Odlund. Okay. So the district court, do you read the district court to agree with you on this point or to disagree with you? I do. I read her to agree with me in that she found that the adjuster in calculating the $114 Do you read the district court to agree that those were cure payments as opposed to payments that can be used to satisfy the liability you incurred from breaching the duty of cure? I think I would have to answer that question by saying that it's not clear to me what she found on remand, Your Honor. I think that when you look at the decision, she certainly did find that additional cure was owed to Magnus Odlund, but she found that it could be reduced by the advances. Let me then ask Al Volk, assuming whatever just came out of our colloquy, why does it matter? There's a lot of discussion about this in the briefing, and I'm trying to figure out why you are focused on that. Is it you're presumably happy with her determination, save for the $400,000 not being $600,000, that the credit is $30,000? More or less, Your Honor. I think it's a little more nuanced in terms of the $400,000 that you just mentioned. You're definitely appealing that point, but otherwise you're happy with the $30,000. And they're not contesting that, so you don't have to worry about that. So now we get to compensatory. Presumably you're saying she was right about that. And then we get to punitives. And on punitives, one argument you could be making is, well, since there was no breach of the duty of cure, obviously there's no punitives. Correct. And I think that we are making that argument. Are you making that argument? Yes, we are. Or are you only making the argument that even if there was a breach, it doesn't matter because it wasn't willful, et cetera? So that's the argument. Which? Those are two different arguments. Which one? Are you making both? Both and the alternative, Your Honor. In the first instance that, as I mentioned, the colloquy we just had, that we did satisfy the obligation to provide cure, that Magnus Einlund didn't incur any out-of-pocket expenses for his treatment. Excuse me. Yes, sir. Hold the thought. I just have one technical question to ask about that. Sure. Is it your position that the district court found that you did not breach the duty of care? That's, I think, a similar question, Mr. Barron. I understand, but it's a slightly different question. I believe that she did without saying that we breached the duty of care to provide cure, in the sense that she did find that an additional amount was owed, which she offset by the advances. And functionally, I think it's- So it's not your position that the district court found that you did not breach the duty of cure? That's correct. Okay. Correct. To get back to my earlier point, so in the first instance, assuming that we didn't breach the duty to provide cure, that Magnus Einlund's reasonable medical expenses were provided at no cost to him, the alternative to that is to the extent that we did breach the duty of cure, there's, as my brother just mentioned, a sliding scale under the maritime law where, in the first instance, a vessel owner has a right to be wrong if the right is reasonable. And in this case, I think that there's no question that it was reasonable where Tufts was paying Magnus Einlund's medical expenses and the vessel owner was providing generous advances. But why is that? Why if the- Certainly, you wouldn't say if Tufts was paying the insurance, you, therefore, could just sit back and do nothing. Or is that your position, you could? No. So the key thing then is the advance payments, right? The key to that is the advance payments coupled with the reduction of Tufts' lien. Okay, but putting aside the lien for a second. Sure. As the advance payments, why are the advance payments indications of you having done anything to cure if they're being made pursuant to an agreement that's not tied to cure, that's tied to all possible liability independent of cure that you may have had at the end of the day based on a judgment? Because the way it's written is not these will be set off against any judgment for a cure obligation. This says whatever liability we may have based on any judgment arising out of your personal injury, these payments will come out of that. So with respect to cure, he has to treat those payments as how do they fulfill the cure obligation? As I mentioned earlier, Your Honor, in the sense that when they were provided, at the time they were provided, the amount was derived by his expense for health insurance. Was he agreeing to that? I don't know that he was agreeing to it. I mean, I guess under contract theory, if you view it as a contract, by accepting the payments with, in the first instance, the understanding that that's how those amounts were calculated. Where did you get that, that he had that understanding? In the adjusters. It's cited in the brief. I'm sorry I don't have the page in front of me. It's in the record appendix where the adjuster notes that he discussed maintenance of cure and what is calculated in maintenance of cure. Discussed with Adlins? With the Adlins, correct. That is meeting with the Adlins. He says passed away suddenly in 2018. And there's no finding by the district court in your favor on that point? I don't believe so. No, I don't think she reached that question. What do you mean she didn't reach it? I thought she said he alone was responsible for the insurance coverage, notwithstanding the advance payments. Doesn't she find that? She did find that, yes. So does she clearly err in finding that? I would say no, Your Honor. I mean, I think she found that in the sense that she looked at the evidence and decided that, you know, in balancing the adjuster's notes with the testimony at trial that she found that it was not. So given that, then it's hard for you to see how there was no, what the logic is for saying there was no breach of the duty of cure in the face of that finding. All that would be left then was he had insurance. Correct. But, as I said, I mean, that amount was ultimately repaid in the form of the advances and in the settlement. But that goes to her conclusion that what you owe for the breach of the duty of cure is nothing because there's a credit. But that doesn't speak to whether there was a breach of the duty of cure. I think then maybe I would say that it was clearly erroneous, Your Honor, that given Mr. Dubois' notes and his conversations with the Adelands, that she should have found that we did not breach the duty of care because when it was provided, or even to the extent that the Adelands didn't understand it as such, that if both Santa Rita II's intent in providing those advances was to assist Mr. Adeland with paying his non-covered expenses. On the punitive, assuming we don't agree with you, I'm not saying we don't, but assuming we don't agree with you that there was no breach of the duty of cure, you nonetheless have her judgment in your favor that there's no punitive owed because it was reasonable in the circumstance. What, on your account, was reasonable if there was a breach of the duty of cure in you thinking that there wasn't? So under the general maritime law, as I was mentioning earlier, there's a sliding scale of liability for a failure to pay maintenance of cure, assuming a failure to pay maintenance of cure. In the first instance, the vessel owner has a right to be reasonably wrong, in which case the damages, if you will, are the cure that was owed. In the extent that the vessel owner's determination was not reasonable, then they become liable for compensatory damages. And what was the reasonable judgment you made that was wrong in your view? And I know you think nothing was wrong, but for purposes of this argument, what was reasonable about the error you made? For purposes of this argument, at the time that Boat Santa Rita II began paying maintenance of cure and the advances, there was an understanding by Boat Santa Rita II that Magnus Oddlund was receiving all of the reasonably necessary medical treatment that he required so that he wasn't abandoned to his fate. Can I ask you a question about that? What if he was receiving adequate care and he was paying out of pocket? There was no additional insurance. He would still not have to pay? No, no. I think in that context, then he absolutely would be incurring the medical expenses. And in that situation, Your Honor, I do think that we would have stepped in, as we frequently do. This is an unusual case in the sense that Tufts, by when Tufts began paying and when we first determined that, made the determination that cure was probably owed, Tufts began paying almost immediately. Whereas the letter from the adjuster overseas that my brother mentioned was dated November of the year. He was injured or became ill in July. So there were several months before it was ultimately determined that we were more likely to not respond. And what if the source of payments for his care was not additional insurance but some other third party gifted him? So that would depend on the nature of the assistance provided to Mr. Oddlund. Under the maritime law, if he's receiving medical treatment at no cost to the seaman, then the vessel owner is relieved of its obligation to provide medical expenses, his medical expenses. The historical context is the U.S. Public Health Service hospitals. When they existed, they were shut down. Let me just put a finer point on the question. He's billed. He gets private care. He's billed. But somebody else pays it for him, a friend or a relative. As I was saying, Your Honor, I think that would depend on the understanding between Magnus Oddlund and the friend and the relative. If it's gifted to him, then the vessel owner is relieved of its obligation. How is that any different than if he paid by himself? It's whether he incurred the cost. So in that case, the court would look to the agreement that Mr. Oddlund had with the source of the funding. So if the court determined that there were a liability or an expense that Magnus Oddlund incurred by accepting that generosity or those funds from his other source, that he would be responsible for those expenses. Did that help you? No further questions. Did you want to speak to maximum medical recovery? Yes, briefly. The duty to provide maintenance and cure runs from the point where the seaman becomes ill or injured to the point where he reaches maximum medical improvement. In the first, Oddlund 1, the panel determined that that wasn't properly presented, although there were several medical records that were referenced in the briefing. Unfortunately, it appears that we didn't properly or adequately explain to the court that those were, in fact, in the trial record. But the district court now has considered them and still ruled against you, right? It has ruled against me, and our argument on appeal is that that decision is clearly erroneous based on those records. Thank you. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, counsel for the appellant has a three-minute rebuttal. Good morning, Your Honor. I'll try to be brief. On the maximum medical improvement, we don't believe that the trial judge in the lower court on remand should have been able to take up that issue. It was decided by this court. No appeal was done. It's over. The trial judge nonetheless took that up, and as Your Honor just said, she did consider the entire record and still found that Mr. Magnus Oddlund has not yet reached maximum medical improvement. Could you address the $400,000 versus $600,000 issue? You're conceding that the $400,000 that was paid to Tufts counts against the amount owed for the breach of the duty of care? Yes, Your Honor. Okay. They say the same basic equitable considerations that support treating the $400,000 should, in all reason, support treating it as $600,000 since that's the value to Oddlund of the deal you struck with Tufts or the deal that they struck with Tufts. What's wrong with that? That entire thesis is based upon the holding of the Fifth Circuit in Gothia, and it says that if Mr. Magnus Oddlund purchases health insurance alone, that the defendant or the boat owner is not entitled to a set-off, and it's a one-for-one application. And then Manderson, also by the Fifth Circuit, said that it's not what the provider charged, but rather what was paid by. Then why are you conceding that the $400,000 is set-off? Because that's under the separate agreement. That's under the advance agreements, Your Honor. No, the $400,000 is the amount that they paid Tufts. Oh, I misunderstood what you said. I apologize for that, Your Honor. You would say the $400,000 that was paid to Tufts to get rid of the lien counts as a set-off against any judgment in your favor for breach of the duty of cure. Because Mr. Oddlund, yes, we agree with that, Your Honor. So what they say isn't the same reasoning that would support treating the $400,000 as a set-off. No, Your Honor. It's sensible to treat $600,000 since that's the value of the deal with Tufts that BSR struck with Tufts to Addlund. What's wrong with that argument? One, Mr. Oddlund had an obligation to Tufts for the $605,000. That was then eliminated by the payment on the day the trial started, Your Honor, six and a half years afterwards. I would say, one, it's inequitable to allow them for that because they have unclean hands doing it the day before the trial. But secondly— But that would be equal to two of the $400,000, right? One more time, Your Honor. That would be equally two of the $400,000. That's what I'm speaking about, the $400,000. But you've conceded that the $400,000 can be used as a set-off. The district court said that. We agreed with the district court that $400,000 paid by Tufts to Tufts the day of the trial should be a credit. Yeah. So they say if that's true, why not treat the value of that deal as a credit, and the value of that deal to Addlund is $600,000? Because it's Mr. Oddlund's right. If Mr. Oddlund had the forethought to have a contractual agreement with Tufts Medical, they should not be allowed to come in and interfere with that contractual relation. That's the underlying bedrock of that argument, Your Honor. Can I ask you another hypothetical? Yes, Your Honor. If the Tufts Insurance clearly covered this cure so that they wouldn't be able to recoup the funds from him or put a lien on somebody else who owed him money, what would happen then? Would he be able to keep the windfall? I submit the answer is yes, Your Honor, because the analysis is not what Tufts, not as what— I'm going to accept that answer just for purposes of the discussion here. And in this circumstance where it was unclear whether Tufts needed to pay that or not, whether he needed to pay them back, why did that change so that now the $400,000 isn't contested, that it gets to be a set-off? In the first instance, it wasn't unclear. It was clear. The defendant knew they had to set it back. There's actually in the scheme section that I talked about, they talk about not letting Tufts know who they are so they don't have to pay Tufts. So it wasn't— I'm sorry. Never mind. I'll work through this myself. It's okay. Okay. I apologize on that, Your Honor. There was a line of questioning earlier to my brother that he spoke about public health hospitals. And that's why in Vaughan there was no cure required because the cure was provided by the public health hospital. And in situations like that, what you— that there could be a set-off with respect to that. Let me try to break it down. It's not—if you receive a gift, it is not compensable under the general matter of time law. But you don't look to Tufts. You look to who the provider is of the health care itself. In this instance, Spalding Rehab and Leahy Hospital and all those providers, they provided medical care to Mr. Ardlin, and they intended to get paid. They never intended to do it as a gift. That's the language of incurring. Once you've incurred the debt, it's fixed. At that point, you've got an obligation to cover that amount for that person as the shipowner. It's like the case where a crew member was injured during World War II, and he went to recuperate at his parents' home. And therefore, he's not entitled to— So I still am puzzled why you think the $400,000 in equity should be a credit against the breach of the duty of care. Because in the situation where the person went to his parents' home, the parents did not intend to get paid. In this situation, you have three layers. You have the provider, you have Tufts, and then you have Mr. Ardlin. In that other situation, you have two. You have the provider and the crew member. Mr. Ardlin had a contractual relationship with Tufts, which he was obligated to pay them back $605,000. They cannot go and interfere in that contractual relation. Okay, so then last time I'm going to ask it. On your theory, why is the $400,000 that BSR paid to Tufts equitably treated as a credit against the breach of the duty of care? Because Mr. Ardlin would have, notwithstanding that payment, Mr. Ardlin would have had to have paid Tufts $605,000. They only now have to pay Tufts $205,000 with that payment. But actually because of that payment, they don't have to pay them even the $205,000. That's BSR's argument. If you're going to treat the $400,000 as equitably a set-off, why not treat the value of the deal as the equitable set-off, which is $600,000? I don't know if it would be an equitable set-off, Your Honor, as much as it would be a contractual set-off. Okay, thank you. Thank you. Thank you, counsel. That concludes argument in this case.